# EXHIBIT L

# EXPERT REPORT OF HARRY C. MCCANN, JR.
## 6504 S. Central Ave.
## Sea Isle City, New Jersey 08243
## 215-460-0398 (C)

## Lavida Clark v Miguel Ortiz, Gregory Carlson and Brendon Boyle

### I.  INTRODUCTION

I, Harry C. McCann, Jr., have been retained as an expert witness to evaluate the facts of the case under generally accepted police procedures. If called to testify at hearing or trial, I expect to give testimony concerning my opinions discussed in this report.

I submit this statement of – and the factual bases for – my opinions. The opinions and facts contained in this statement are based in part on information made available to me in this case on or before the date of this report. I expressly reserve the right to supplement or modify this statement if and when I acquire additional relevant information before the trial. I reserve the right to modify this report based upon that information should it become available.

### A.  Background and Qualifications

I am currently retired as of September 2014 from the position of Director of Law Enforcement Training for the Bucks County, Pennsylvania. Prior to this position, my title was Director of Police Training for Bucks County having served in this position from 1989 to 2002. The new title reflects additional responsibilities given to me by the Bucks County Commissioners to assist the Bucks County Department of Corrections in the oversight of its in-service and correctional academy program.

Duties in both positions included the development of lesson plans, instructor certification and the development of an ongoing training curriculum. I had also been tasked to assist various county law enforcement agencies in developing and writing policy and procedures relating to the use of force, patrol procedures, special response team, legal aspects, arrest powers and staff training.

I was an adjunct instructor at Bucks County Community College teaching various criminal

1

justice programs in the school of Behavioral and Professional sciences for 30 years.
I have also taught in the Police Officer Basic Academy Program (Act 120) for Temple University for 22 years.

In addition, I hold certifications to teach from the Municipal Police Officers Education and Training Commission and the Penna. Department of Corrections.

I have also been an adjunct faculty member in the Criminal Justice department at Delaware Valley College and Montgomery County Community College.

I am a graduate of LaSalle University in Philadelphia, PA, with a Bachelor of Arts degree majoring in criminal justice and I have received a Master's degree in Public Administration from Penn State University in 1983.

I have been acknowledged as a "Best Practices Leader" in Bucks County in 2007 and have received numerous awards from various organizations such as the Bucks County Police Chiefs Association, the Bucks County Police Association, the Fraternal Order of Police, Bucks County Lodge #53, the U.S. Department of Justice, Drug Enforcement Administration, the German American Police Association and a Governor's Highway Safety Award.

In rendering this opinion, I have utilized my education and expertise in law enforcement and academia which covers 37 years.

**B.  Fees**

I am an independent expert, and I receive compensation of $175/hour, plus reimbursement for any expenses incurred. My compensation does not depend on the opinions I express in this report, my testimony, or the outcome of this litigation.

**C.  List of Trial or Deposition Experience in Previous 4 Years**

*Farvardin vs. Tpr. Santos et al,* C.A. No. 12-6680 (E.D. Pa. 2014) Expert for the plaintiff in a use of force, policy/procedure case

*United States vs Dwight Hamilton* 1:15-CR-240 (TCB) Expert for the defendant in a use of force case

### D. List of Publications

Lock Up USA video productions - "Use of Force in the Correctional Facility"

### E. Preparation and Basis for Opinions

My opinion is based upon the review of the materials and information made available to me.

I have reviewed the following documents in rendering my opinions:

* Depositions of Defendants, Depositions of Stephan Manns, John Laufer, Tiasia Clark, Stephen Smith, Nyelle Clark, Qiana Tredwell, Daejahne Clark and Lavida Clark
* Google map of the area in question
* Incident report of Officer Ortiz
* Statement of Lavida Clark
* Criminal complaint filed against Dawn Gerald
* Radio room communication records
* Washington Hose Co. EMS checklist
* Mr. Kings notice of claim against the City of Coatesville
* Statement of Cpl. Boyle and Officer Carlson
* City of Coatesville Police Dept. Handcuff policy
* City of Coatesville Police Dept. Use of Force policy
* Use of Force examination of Officer Carlson, Ortiz and Cpl. Boyle
* Deposition of Adrienne Townsen M.D., Dr. Kevin McCabe and Dr. Thomas Whalen
* Web pages of the Coatesville Police Dept.

In an attempt to minimize personal information of the parties (i.e. SSN, addresses, etc.), I have asked Mr. King limited personal information such as height, weight etc.

I reserve the right to change or modify this report should additional facts, documents or evidence become available to me.

## II. METHODOLOGY

Plaintiff's counsel asked that I render opinions about whether Lavida Clark was unlawfully seized or whether or not she was subjected to excessive use of force under the

3

standards applied by the federal courts to police procedures for lawful search and seizures.

The standard applied for investigative detention was whether the officers had a reasonable suspicion to believe that Ms. Clark *may* have committed an offense, giving consideration to all the facts and circumstances known to them at the time. The standard applied for probable cause to arrest was whether the police had reasonable grounds to believe she had committed a crime.

For the excessive force issues, I have considered the totality of the circumstances known to each officer at the times force was applied, if any. It pays careful attention to all relevant facts and circumstances, including the seriousness of the crime, if any, contended to have been committed by Ms. Clark, whether, how and why she imposed an immediate threat to the safety of the officers or others and whether she was actively resisting arrest or attempting to evade arrest by flight. Other questions such as, does she have a weapon? What information did the officers have suggesting they stop using force? The number of officers involved, and size and weight of those involved, whether Ms. Clark was compliant or resistant when different forces were employed, whether and to what extent force was reasonable, and all other factors in the totality of the circumstances that were known by the officers will be explored. It will also consider the duty of a police officer to stop applying force once the facts changed and the reason and type of permissible force.

My focus does not involve hindsight. I have taught various programs in police and correctional practices about these types of events under the laws and constitutions of Pennsylvania and the United States. In rendering my opinions, I place myself in the shoes of the police officers, facing the total circumstances presented to them at the time force was applied and whether the force that was applied was reasonable. It does not mix up departmental regulations or other violations than those actually involving the seizure or use of force, except to the extent general accepted practices that could have avoided a constitutional violation were or were not employed.

I have been asked to render an opinion about other standard police practices and procedures applying to a reasonable suspicion for investigative detention, probable cause to arrest and the use of force in this case. I have also been asked to render an opinion on whether generally accepted police procedures were applied after the use of force. The facts or opinions stated in this report are not to be read as this writer's opinion on credibility.

### III.  CRONOLOGY AND SUMMARY OF CONFLICTING TESTIMONY

There are credibility issues and factual disputes between the parties to be resolved by the court or a jury. The following is a summary of the contested facts, and some uncontested facts, seen from the depositions and documents.

In, 2012, Ms. Clark had a work injury to her shoulders, diagnosed as bilateral carpal tunnel and shoulder impingement syndrome. Over the next couple of years, she had surgery, was disabled and received Workers Compensation benefits. Her treating physicians, Dr. Townsen, Dr. McCabe and Dr. Whalen report she had much recovered from the shoulder treatment as of August 2014, except for pain management. Then, the events of September 4, 2014 both aggravated her shoulder condition and caused new injuries to her shoulders, neck and back, requiring treatment.

On September 4, 2014, at approximately 2000 hours, Officer Miguel Ortiz (44 yrs. old; height 6'3"; 289 lbs.) of the Coatesville (PA) police department was dispatched by county radio to a disturbance call at 335 S. First Ave. Upon his arrival in the alley behind the residence, where cars were parked, he made contact with Ms. Lavida Clark (36 yrs. old; height 5'10"; 196 lbs.) who advised him that her call was about a dispute with a neighbor, Dawn Gerald, who lived several houses down the alley. The locale was on Pine Alley, with vehicles lined close and parallel to the back of the houses.

While Officer Ortiz was speaking to Ms. Clark, Ms. Gerald ran from the back of her house and attacked Ms. Clark, attempting to punch and scratch her. Ms. Clark testified that aside from her cheek being grazed, she suffered no injury. Ms. Gerald is described as about 5 feet 3 inches but very hefty. It does not appear that Ms. Clark sustained any injuries affecting her torso. By this time. Cpl. Boyle (29 yrs. old; height 6'; 200 lbs.) arrived, stopping his vehicle behind Officer Ortiz in his patrol car. Officer Carlson (29 yrs. old; height 6'; 200 lbs.) also arrived, stopping behind Cpl. Boyle's vehicle. Cpl. Boyle reports that when he arrived, Officer Ortiz was still in his vehicle. When Ofc. Ortiz was able to exit his vehicle he was joined by Cpl. Boyle and Officer Carlson in separating the women. Ortiz physically pulled Ms. Gerald off, without resistance, while Carlson pulled Ms. Clark away by the left arm, and Cpl. Boyle pulling her right arm. At this point, the breach of the peace between the women was over.

Sequentially, the testimony then materially diverges. Officer Carlson and Cpl. Boyle say they physically "directed" or "walked" Ms. Clark backward, their hands respectively holding each of her arms until they reached a point behind a parked car, then attempted

5

to handcuff her as a subject for a detention (this assumes they were not pulling her as described by other witnesses) to the rear of a vehicle. Both testified that Ms. Clark did not resist or threaten resistance until they attempted to handcuff her. She was not armed. She did not verbally threaten the officers. After taking her back some distance, they attempted to handcuff her, whereupon, for the first time, she attempted to pull her arms to her body. Surprisingly, and contrary to the training given all Pennsylvania police officers, they both characterized their holding of her person thus restricting/controlling her motor functions and movement, while "directing" her in the alley as not being use of force.

Ms. Clark and several witnesses in the alley testified that the officers pulled her arms back as she complained of pain. Other witnesses testified either that they shouted that Ms. Clark had shoulder surgery, or bad shoulders, shoulder injuries, couldn't move her arms like that, or similar such phrases, but the officers continued to pull her arms behind her back until handcuffing her behind a car. The location, distance and type of car vary according to each witness.

Ms. Clark's cousin, Stephen Manns, testified that he approached the officers and Ms. Clark while they passed, told them she was recovering from shoulder surgery and was ordered to step back or he would be arrested too.

The Officer In Command was Officer Ortiz, being the first officer to respond to the scene. He testified to not seeing how Ms. Clark was handcuffed. He testifies that he subdued Ms. Gerald, handcuffed her without resistance while arresting her and put her in the back of his patrol car. He testifies that Ms. Clark was already in the back of Cpl. Boyle's car when he approached the other officers. Contrarily, Ms. Clark claims that he returned to their location behind a car 2 1/2 car length behind Ortiz's car, where Carlson and Boyle were holding her before she was handcuffed. She testified that she again complained to Ofc. Ortiz about her shoulders, already having done so to Boyle and Carlson several times. She testified that Ofc. Ortiz then removed his flashlight, lifted the shoulder area of her blouse, viewed it with the flashlight, then stepped back and nodded to Carlson and Boyle, who then proceeded to pull her arms further back, take her down onto the trunk of a parked car, forearm braced against her neck, while it was twisted beyond its range of motion. Her testimony is that she was pushed onto the back of a car, with a forearm pressed against the back of her neck and violently handcuffed. Ms. Clark then was placed

6

in the back of a patrol car.

All the parties agree that, after handcuffing, the police huddled. One of them returned and apologized, because she was the victim, then released her from the handcuffs. She was asked and agreed to return to the station, where Officer Ortiz directed her to write a statement, but only of the facts that caused the police to be called, not what happened after they arrived. She wrote such a statement, though the officers deny she was so instructed.

Officer Carlson's written statement and deposition testimony is nebulous. He reports arriving at the scene moments after Cpl. Boyle and witnessing two women engaged combatively, in a "physical fight", but "could not say what Ms. Clark was doing." The officers uniformly deny hearing anyone saying Ms. Clark or anyone complaining of pain, shoulder injury or shoulder surgery, except Officer Carlson who acknowledges "at the moment the handcuffs were being placed on the *females*, I can recall something being said about the *females'* shoulder being injured".

All other witnesses who observed the contact between Gerald and Clark identify Ms. Gerald as the aggressor, including Officer Ortiz. Officer Ortiz identifies Ms. Clark as his "Victim", describing the occasion for self-defense. Both Carlson's and Boyle's statements, written 5 months after the event, do not address the question of who was the aggressor or explain the reasonable grounds to believe mutual combat was involved, as opposed to an assault where Ms. Clark exercised self-defense. Their decision to handcuff and arrest Ms. Clark was not based on the totality of the circumstances, which they did not have, until consulting with Ofc. Ortiz.

At the police station, Ms. Clark complained of shoulder pain. The local city EMS was called who examined her and noted her complaints of pain. She declined being taken to the hospital, which had not been offered by the police directly from the scene. Ms. Clark declined the EMS offer because they would not provide a ride home from the hospital. Instead, she went home and went to the hospital the next day when she had a ride.

The Coatesville City Police Department Manual requires that the officers notify and file a written report to the Chief of Police of any injury claims arising in relation to an arrest or incident where there is a complaint of harm. No such report was filed or given the Chief. Further, Officers Carlson and Boyle did not even file incident reports, although an arrest was made and Gerald's prosecution was pending where they could have been witnesses. Both use of excessive force and failure to comply with these procedures are grounds for discipline, which was not rendered. In February 2015, counsel for Ms. Clark gave written

7

notice to the City of Coatesville of Ms. Clarks claims, including the injuries she sustained. The Chief of Police did not request a formal police report at that time but accepted undated letters, apparently by email. He conducted no internal investigation of the complaints, contrary to departmental rules. The officers have yet to submit formal reports. No discipline has been imposed.

## IV. ANALYSIS OF MS. CLARK'S CLAIM

A. It is my opinion that the defendant police officers having knowledge of the totality of the circumstance <u>did not</u> violate Ms. Clark's rights when they first grabbed her person. Although the aggressor was Ms. Gerald and Ms. Clark had the right to exercise self-defense, a breach of the peace was occurring that required the officers to exercise their police powers, including the use of reasonable force, to restore order. The use of force in pulling Ms. Clark away was reasonable and necessary, in fact required, to restore the peace with the minimum risk of injury to either of the women or the officers.

B. Once the women were separated and Ms. Gerald being restrained by Officer Ortiz, the occasion for the initial exercise of force had ended. The officers were required to cease and desist their use of force, unless new or other circumstances required it. The officers' agreement under oath that Ms. Clark did not resist in any way negates any claim or issue of fact about what they describe as her later resistance to handcuffing. The time between these events was at least several minutes and the officers had ample time to stop applying force and alter their course of conduct. Their testimony establishes a clear defining line between the activity authorizing the exercise of their police power in the first event and subsequent events.

Their claims that this activity did not involve force is contrary to human experience, the law of physics and generally accepted standards of and police procedure and practice. A police officer's mere presence is not physical force, but is coercive in effect. A police officer's verbal orders can be a restriction to freedom, but are not force. A police officer grabbing a person and using their grasp and leverage to control the movements of another, even where lawful, is undeniably a use of force. Holding and drawing Ms. Clark backward, whether slowly or violently, was a new use of force, for separate purposes than restoring the peace. When the initial confrontation was over, so should have the use of force.

The importance of the Officer In Charge goes to the heart of a reasonable police officers only acting with all available information in determining whether or not to handcuff or arrest a suspect. The Officer In Charge is the first officer to arrive at the scene, regardless of rank. The reason is that the first person to arrive at the scene has a better understanding of the incident then those who arrive later. It is his duty, if time allows, to communicate to other officers arriving at the scene the history of events and status of the matter. It is the duty of the other officers arriving on the scene, if time allows, to consult with the Officer in Charge to learn all available facts in order to make reasoned decisions, such as whether to use force, make an arrest, etc.

There is no question here that time did not allow for such consultation before the initial confrontation between Ms. Clark an Ms. Gerald. However, once separated, with Ms. Clark's nonresistance, the next step taken by the officers should have been to consult with Ortiz before taking further action, unless there were exigent circumstances requiring otherwise. In this case, according to their own testimony, both Ms. Clark and Ms. Gerald were unthreatening and offered no resistance as the officers took control. According to them, Ms. Clark only became resistant after they had taken her to the back of another car and attempted to handcuff her. Although she was seized, it was reasonable to hold her until consulting with their Officer In Charge, Ortiz, for purposes of investigative detention.

It also was part of the sequence of events the officers had within their knowledge when deciding whether or not to apply the force of handcuffing and arrest, instead of deferring it until they had done so. In other words. the start of the use of force comprised of holding her as a suspect for investigative detention, was reasonable, but only for purposes of consulting with Officer Ortiz. This force was reasonable because they had seen a confrontation raising a reasonable suspicion that the women were fighting, but there was insufficient information for probable cause to arrest. The handcuffing and act of arresting her were unreasonable under the totality of the circumstances known to them. That they knew it is evidenced by the fact that they then huddled, just too late. Their ultimate decision not to arrest Ms. Clark was based upon the totality of the circumstances.

A closely related standard procedure is the verbal order or warning, to minimize possible force necessary to handcuff someone. In this case, neither of the officers told Ms. Clark she was being placed under arrest or that they were going to handcuff her, and she was to place her hands behind her back. This notice and commands are standard and necessary prerequisites to minimize the necessary use of force and avoid excessive use of force. If possible, it

9

should be stated even if the suspect is threatening or acting in a violent manner, which the officers admit she was not.

After separating the women, the exigent circumstances and reason for force was over. Ms. Clark was docile and compliant, and in no way threatening. She had no weapon; they carried several. There were three of them, only one of her. There were no facts to support a reasonable conclusion that she was a danger to the officers or others in the vicinity. Had they followed generally accepted police practices and procedures and consulted with their Officer in Charge, they would have known they were exercising the use of force without the knowledge of the totality of the circumstances. This opinion is not based upon hindsight; it is based on their own testimony. No police force can be exercised without a sound reason or basis for it.

In my opinion, Ms. Clark's right to be free from unlawful seizure also was violated when the officers arrested her, as opposed to reasonable suspicion they had for investigative detention. Neither provided knowledge of how the ladies' conflict was precipitated, just the legal conclusion they were "fighting". Informally writing, with knowledge of the civil rights claim, five months after the incident, they still failed to articulate what Ms. Clark did that constituted fighting, as opposed to self-defense. They did not outline the facts they observed which led to their legal conclusion. Carlson and Boyle failed to ask Officer Ortiz before acting, and applied excessive force without all available information. This conduct also changed an investigative detention into an arrest without probable cause. The very purpose of the practice of Officer In Charge is to provide a safeguard against unlawful searches and seizures based upon insufficient information to establish probable cause. It's violation here led to and was a direct part of both Fourth Amendment violations.

Any defense that they didn't have enough time to consult is negated by their own testimony. It is contrary to their own version of the facts, as well as the other witnesses. According to Boyle, there was time to *walk her back*. Under Carlson's version, there was time to guide or direct her backward without the use of any force but her own. In other words, there were no exigent circumstances to support their forcible compulsion.

If the other witnesses' versions of the events are accepted by the court or jury, the violations of the Fourth Amendment are more extensive and prolonged.

Those witnesses have the officers forcibly pulling her arms backward, by the wrist or further up, while she repeatedly complained of shoulder pain and shoulder surgery, with her children and others joining in chorus from the separation of the women to the back of the car where she was handcuffed. In this regard, the officers' testimony minimizes the distance and therefore the

10

time. The officers, in deposition, estimated the length of their patrol cars to be 8 to 12 feet. A standard police patrol car, depending upon the model, is 16 to 18 feet long.

Underestimating the length of the vehicle significantly shortens the distance and time between separating the women and the handcuffing, including the distance over which the police held, directed, guided, pulled or dragged Ms. Clark, depending upon the witness. over which course Ms. Clark and other witnesses testify they repeatedly advised throughout the incident that she could not put her arms back, had shoulder surgery, etc., until the point of handcuffing.

Not only Ms. Clark but other witnesses put 3 officers at the back of the car during the handcuffing, which, if believed, would mean Ortiz was there, contrary to his testimony. Although they did not know names, Ms. Clark and other witnesses identified the "bald" policeman as being there and participating. Upon inquiry of counsel, Mr. King, I am advised that the bald police officer would have been Officer Ortiz. One of her daughters testified to seeing a flashlight used by one of the officers at the back of the car. Depending upon what testimony of the other witnesses the jury believes the violations of the Fourth Amendment that the amount of force was excessive are supported by the testimony of all the witnesses, including the officers themselves.

It is my opinion that the officers used excessive force in how they carried out and how much force they applied, under the totality of the circumstances. Even if they had probable cause to arrest (which in my opinion they did not), there was no reason to forcibly pull her arms behind her back without (1) telling her she was under arrest; (2) advising her that she needed to be handcuffed; (3) asking/directing that she place her arms to her sides or behind her, and (4) "directing" her hands behind her back the way Officer Carlson says he led her to the back of the car.

Had the officers followed these generally accepted procedures for handcuffing, according to their own version of events, they would have learned about Ms. Clarks shoulder injury and inability to comply and would have placed the handcuffs in front of her.

## V. CONCLUSION

All of the opinions I have offered in this report are based on the data listed in the

Preparation and Basis for Opinions section of this report. In forming these opinions, I have relied on the knowledge and experience that I have garnered in 35 years as a parole officer, parole trainer, director of police training, director of law enforcement training and as a correctional and police trainer. In addition, I have employed my education and training in the field of law enforcement to guide me in the formation of these opinions.

I reserve the right to supplement my opinions in light of further information disclosed in the case. I also reserve the right to supplement my report to rebut any opinions expressed by any experts retained by the Defendants.

_____  
Harry C. McCann, Jr.

_12/2/17_____  
Date